In re Thomas Edward MANNING, Debtor.

**National City Bank, Plaintiff,**

v.

**Thomas Edward Manning, Defendant.**

Bankruptcy No. 00–35809.
Adversary No. 01–3025.

United States Bankruptcy Court, S.D. Ohio, Western Division.

March 28, 2002.

John L. Day, Jr., Cincinnati, OH, for plaintiff.

Barry S. Galen, Dayton, OH, for defendant.

Thomas Noland, Dayton, OH, Chapter 7 Trustee.

### *MEMORANDUM OPINION*

JOHN E. HOFFMAN, Jr., Bankruptcy Judge.

National City Bank ("NCB") has filed a complaint to determine the dischargeability of a $7,061.43 credit card obligation (the "Card Obligation") incurred by the debtor

Thomas Edward Manning ("Manning" or "Debtor") approximately one month before he filed his voluntary Chapter 7 petition on November 3, 2000 (the "Petition Date"). NCB seeks a determination that the Card Obligation is nondischargeable under 11 U.S.C. § 523(a)(2)(A), asserting that Manning obtained the debt by false representation. Before reaching the issue of the dischargeability of the Card Obligation under § 523(a)(2)(A), the Court first must make a determination of the applicability of § 523(a)(2)(C) of the Bankruptcy Code, which establishes a presumption of nondischargeability for certain cash advances obtained by an individual debtor on or within 60 days before an order for relief is entered.

This memorandum opinion constitutes the Court's findings of fact and conclusions of law. *See* Fed.R.Civ.P. 52 (made applicable here by Fed.R.Bankr.P. 7052).

## I. *Jurisdiction*

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and the general order of reference entered in this district. This is a core proceeding. 28 U.S.C. § 157(b)(2).

## II. *Factual and Procedural Background*

Manning is employed as a production manager for Home Towne Construction Company ("Home Towne"). As production manager, he is responsible for supervising Home Towne's residential remodeling projects. Manning earns an annual salary of approximately $30,000. He was divorced in 1998 and has remarried. His wife also works for Home Towne and she too earns approximately $30,000 a year.

Manning testified that he began experiencing financial difficulties following his

divorce in 1998. Pursuant to the divorce decree, he is required to pay his ex-wife $673.18 per month in alimony and child support. Manning testified that the $673.18 monthly alimony/support obligation will terminate in 2002, although he did not specify the exact date of termination. Manning also was ordered by the state domestic relations court to assume certain marital debts and hold his ex-wife harmless on these obligations. Among the marital debts Manning was required to assume were two credit card obligations, including the outstanding balance on a Visa card issued by NCB. He and his ex-wife had maintained the joint NCB Visa account for approximately ten years before their divorce. Manning paid off the NCB Visa card account (as well as the second joint credit card obligation) by transferring the balances to other credit cards that had been issued in his name only.

After paying off the NCB joint obligation, Manning apparently had his ex-wife's name removed from the account. Thereafter, he continued to use the NCB Visa card. Following the divorce, Manning also incurred charges on credit cards issued by Capital One (Platinum Visa), Peoples Bank (Visa), Citibank (Platinum Select), and Chase (Visa Gold).

By March 2000, Manning was having difficulty maintaining payments on his credit card accounts. He consulted with a bankruptcy attorney at that time. Manning advised his attorney that he wished to avoid filing for bankruptcy relief because he believed it would destroy his ability to obtain credit. Manning testified that he had an excellent credit rating until his divorce.[1] He also informed his attorney

---

**1.** Although Manning testified that his credit record was excellent until his divorce in 1998, he also stated that he had consulted with a credit counselor in 1995. No testimony was

elicited concerning the circumstances that led Manning to seek credit counseling at that time.

that he hoped to continue making at least the minimum monthly payments on his credit card accounts until 2002, when his alimony/support obligation would cease. Manning stated that he intended to use the additional disposable income he would have when this obligation terminated to pay down and eventually fully satisfy his credit card debts. Manning discussed this strategy with his attorney in the March 2000 meeting. He was advised by his attorney not to seek bankruptcy protection at that time.

Manning testified that he considered obtaining a second job in order to increase his monthly disposable income.[2] However, because his duties at Home Towne required him to be "on call" during evening hours, he was unable to do so. Manning also asked his supervisor at Home Towne for a raise, but his request for a salary increase was denied.

In order to maintain minimum monthly credit card payments until his alimony/support obligation terminated, Manning regularly transferred credit card account balances from one card to another. These balance transfers enabled Manning to take advantage of low, introductory interest rates, thereby decreasing his total monthly payments. Manning testified that after an introductory rate on a credit card account expired he would attempt to transfer the outstanding balance to the account of a competing card issuer offering its own introductory rate. The following balance transfers were made by Manning between July 2, 1998 and October 16, 2000:

1. July 2, 1998—balance of $2000 transferred from Chase Gold Visa (21.74% interest) to Capital One Platinum Visa (9.9% interest);

2. March 2, 1999—balance of $862.18 transferred from Chase Gold Visa (21.74% interest) to Capital One Platinum Visa (9.9% interest);

3. April 14, 1999—balance of $5,000 transferred from Capital One Platinum Visa (9.9% interest) to People's Bank Visa (3.9% interest);

4. July 9, 1999—balance of $4,900 transferred from NCB Visa (14.15% interest) to Capital One Platinum Visa (9.9% interest);

5. November 19, 1999—balance of $4,400 transferred from People's Bank Visa (15.9% interest) to Citibank Platinum Select (6.99% interest);

6. June 30, 2000—balance of $3,791.75 transferred from Citibank Platinum Select (10.65% interest) to People's Bank Visa (9.9% interest);

7. July 5, 2000—balance of $770.04 transferred from NCB Visa (15.4% interest) to People's Bank Visa (9.9% interest); and

8. October 4, 2000—balance of $7,061.43 transferred from People's Bank Visa (12.99% interest) to NCB Visa (9.9% interest) (the "Final Balance Transfer").[3]

*See* Debtor's Exhibit A. Manning testified that he made the foregoing balance transfers in order to manage cash flow until his alimony/support obligation ceased in 2002.

By making prepetition balance transfers, Manning paid off the People's Bank Visa and Citibank Platinum Select card accounts before filing his Chapter 7 case. As of the Petition Date, Manning had un-

---

**2.** In Schedules I and J filed with his bankruptcy petition, Manning listed total net monthly income of $2,618.66 and monthly expenditures totaling $2,664.

**3.** The Final Balance Transfer was posted to Manning's NCB Visa account on October 16, 2000. However, Manning's unrebutted testimony was that he requested the balance transfer on October 4, 2000.

paid credit card balances with NCB, Capital One, and Chase. He listed the following debts in his schedule of unsecured, nonpriority claims:

| | |
|---|---|
| Capital One—Platinum Visa Account | $ 5,736.00 |
| Chase Visa—Gold Account | $ 1,000.00 |
| NCB—Visa Account | $ 7,650.00 |
| Katherine Billingham (divorce attorney) | $ 1,497.29 |
| Total | $15,883.29 |

Manning listed no secured claims or unsecured, priority claims in his schedules of liabilities.

The Final Balance Transfer, which is the subject of this dischargeability action, was initiated by Manning on October 4, 2000. Manning testified that he became aware of a special 9.9% balance transfer offer from NCB sometime prior to that date. Manning could not remember whether he learned of this offer by way of a written or telephonic solicitation from NCB. Nor could Manning recall whether he initiated the Final Balance Transfer telephonically or by completing a "check" issued by NCB to facilitate the balance transfer. The following statement is contained in the "Classic Card Summary" that Manning received from NCB after the Final Balance Transfer was made (the "November 1 Statement"):

*******SPECIAL 9.9% BALANCE TRANSFER OFFER*************
THANK YOU FOR TAKING ADVANTAGE OF THE SPECIAL BALANCE TRANSFER OPPORTUNITY. YOUR SPECIAL RATE IS APPLIED TO THE OUTSTANDING BALANCE OF $7,097.81. THE RATE IS EFFEC-

TIVE UNTIL THE BALANCE IS PAID IN FULL

*See* Joint Exhibit 3.[4]

To enable Manning to make the Final Balance Transfer, NCB raised his credit limit from $7,000 to $8,000. The November 1 Statement reflects that the balance due on the NCB Visa account was $617.33 before the Final Balance Transfer was made. *See id.*

In the 11 months preceding the Petition Date, Manning failed to make the minimum payment due on the NCB Visa account only once—in October 2000, the month before the Petition Date. *See id.* Manning made payments in excess of the minimum monthly amount due on the NCB Visa account in the months of December 1999 and February, March, May, June, and August 2000. In fact, in March 2000, Manning paid off the account; and, as of May 2, 2000, the NCB Visa account statement reflected a credit balance of $43.61. *See id.*

Manning met with his bankruptcy attorney on October 16, 2000 (the same date that NCB posted the $7,061.43 Final Balance Transfer to his Visa account). He had called to schedule an appointment with his attorney several days before. Manning stated that he made the appointment with his bankruptcy attorney after coming to the realization that he simply did not have sufficient income to continue to make minimum monthly credit card payments and satisfy his other obligations. Yet, according to Manning, he did not make a final decision to file his Chapter 7 case until he consulted with his attorney. Manning's attorney advised him that his history of delinquent payments had irreparably

---

4. The $7,097.81 sum referenced in the November 1 Statement includes the $7,061.43 principal amount transferred to the NCB Visa account plus a $36.38 finance charge. NCB's Complaint seeks a judgment declaring only the principal amount of Final Balance Transfer—i.e., $7,061.43—to be nondischargeable under § 523(a)(2)(A).

damaged his credit record. Because he felt that he was no longer creditworthy, Manning reluctantly decided to seek bankruptcy relief. Manning filed his voluntary petition 30 days after he initiated the Final Balance Transfer and 18 days after the second meeting with his bankruptcy attorney.

At trial, the parties stipulated that the only contested issue of fact to be determined by the Court was whether Manning had the intent to repay the Card Obligation at the time he initiated the Final Balance Transfer.

### III. *Arguments of the Parties*

NCB asserts that, in making the Final Balance Transfer, Manning received a "cash advance" within 60 days of the Petition Date, thus triggering § 523(a)(2)(C)'s presumption of nondischargeability. According to NCB, Manning failed to present sufficient evidence to rebut the presumption that the Card Obligation is nondischargeable.

Manning took no position with respect to the applicability of the § 523(a)(2)(C) presumption. At trial, his counsel did not concede that the Final Balance Transfer was made by way of a cash advance from NCB. But he failed to argue the contrary—i.e., that the Card Obligation should not be subject to § 523(a)(2)(C)'s presumption of nondischargeability. Manning's counsel simply did not respond to NCB's contention that the § 523(a)(2)(C) presumption applies.[5]

Arguing in the alternative, NCB maintains that even if the Court determines

that § 523(a)(2)(C)'s presumption of non-dischargeability does not apply, the evidence nevertheless clearly establishes that the Card Obligation was incurred by Manning's false representation, thus rendering the debt nondischargeable under § 523(a)(2)(A). Specifically, NCB asserts that: (1) Manning made an implied representation of his intent to repay the Card Obligation at the time he initiated the Final Balance Transfer; and (2) this implied representation was false, or was made with reckless disregard for the truth. As evidence of the falsity of Manning's implied representation of his intent to repay the Card Obligation, NCB cites the timing of the Final Balance Transfer and Manning's financial condition at the time the debt was incurred. According to NCB, the fact that the Final Balance Transfer was made only two weeks before Manning's second meeting with his bankruptcy counsel, and just a month before the Petition Date, strongly suggests that Manning had no intention of repaying NCB at the time he incurred the Card Obligation. NCB points out that there had been no discernible improvement in Manning's financial condition from the time he initially consulted with his bankruptcy attorney in March 2000 through the date that he made the Final Balance Transfer. NCB argues that, given his dire financial condition, Manning must have known that he could not possibly repay the Card Obligation at the time he incurred the debt.

Finally, NCB contends that the series of balance transfers made by Manning also establishes his fraudulent intent. Accord-

---

**5.** In answering NCB's complaint, Manning admitted the following allegation: "On or about October 16, 2000 the debtor took a cash advance *or* balance transfer of $7,061.43." *See* NCB Complaint (Adv.Doc.1–1, ¶ 4) (emphasis added); Debtor's Answer (Adv.Doc.3–1, ¶ 1). However, because NCB phrased this allegation in the disjunctive (i.e., asserting

that Manning obtained a cash advance *or* balance transfer), the Court cannot conclude that Manning's Answer contains a definitive admission that he received a cash advance within 60 days of the Petition Date, which would make applicable § 523(a)(2)(C)'s presumption of nondischargeability.

ing to NCB, Manning made the balance transfers to create the illusion of payment when, in fact, he had no intention of repaying the credit card debts, including the Card Obligation. This course of conduct, NCB argues, is akin to a fraudulent "kiting" scheme.

Manning responds by asserting that he did not engage in fraudulent conduct. He denies that he had no intention of repaying NCB at the time he initiated the Final Balance Transfer. Manning concedes that the timing of the October 4, 2000 Final Balance Transfer—in relation to both his October 16, 2000 meeting with bankruptcy counsel and the Petition Date (November 3, 2000)—may appear to be suspect. But the timing of the Final Balance Transfer, Manning testified, was driven by his receipt of NCB's 9.9% balance transfer offer, not by a preconceived plan to incur the Card Obligation and then immediately discharge the debt through a bankruptcy filing. Manning also testified that he made the Final Balance Transfer in accordance with his strategy of continually shifting credit card obligations to the accounts bearing the lowest interest rates and using balance transfers in order to buy time until his alimony/support obligation terminated. According to Manning, he did not make the decision to abandon this strategy and seek bankruptcy relief until he met with his attorney on October 16, 2000.

## IV. *Legal Analysis*

### A. *The Statutory Framework*

NCB asserts that the Card Obligation is excepted from discharge by § 523(a)(2)(A) of the Bankruptcy Code, which states:

> (a) A discharge under section 727, 1141, 1228(a) 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

> . . . .

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; . . . .

11 U.S.C. § 523(a)(2)(A).

The presumption of nondischargeability relied on by NCB is contained in § 523(a)(2)(C), which relates back to § 523(a)(2)(A). The version of § 523(a)(2)(C) in effect on the Petition Date provided:

> (C) for purposes of subparagraph (A) of this paragraph, consumer debts owed to a single creditor and aggregating more than $1,075 for "luxury goods or services" incurred by an individual debtor on or within 60 days before the order for relief under this title, or cash advances aggregating more than $1,075 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within 60 days before the order for relief under this title, are presumed to be nondischargeable; "luxury goods or services" do not include goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor; an extension of consumer credit under an open end credit plan is to be defined for purposes of this subparagraph as it is defined in the Consumer Credit Protection Act; . . . .

11 U.S.C. § 523(a)(2)(C).[6]

### B. *Applicability of the § 523(a)(2)(C) Presumption*

▮▮▮▮ A creditor has the burden of proving by a preponderance of the evi-

---

**6.** In 1994, Congress amended 11 U.S.C. § 104, governing the adjustment of dollar amounts contained in certain sections of the Bankruptcy Code, by adding a provision that

dence that a debt is nondischargeable under § 523(a)(2)(A). *See Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Rembert v. AT & T Universal Card Servs., Inc., (In re Rembert),* 141 F.3d 277, 281 (6th Cir.1998). But if § 523(a)(2)(C)'s presumption applies, then, at a minimum, Manning would have the burden of going forward with evidence to rebut the presumption.[7] *See First Deposit Nat'l Bank v. Cameron (In re Cameron),* 219 B.R. 531, 536 (Bankr. W.D.Mo.1998). Thus, to determine the proper allocation of the parties' respective evidentiary burdens, the Court must decide at the outset whether the § 523(a)(2)(C) presumption of nondischargeability applies to the Card Obligation.

 NCB has the burden of proving that the § 523(a)(2)(C) presumption applies. *See Chase Manhattan Bank USA, N.A. v. Poor (In re Poor),* 219 B.R. 332, 335 (Bankr.D.Me.1998); *Koch,* 83 B.R. at 902. As previously stated, the parties did not address the issue of the applicability of § 523(a)(2)(C)'s presumption of nondis-

chargeability at trial. NCB's counsel simply argued that the presumption applied without providing any support for this assertion. Manning's counsel did not respond to NCB's argument. He neither conceded the presumption's applicability nor asserted that the Final Balance Transfer does not constitute a § 523(a)(2)(C) "cash advance." Based upon its independent analysis of the issue, the Court concludes that, in obtaining the extension of credit from NCB necessary to make the Final Balance Transfer, Manning did not receive an advance of "cash" within the meaning of § 523(a)(2)(C). The Card Obligation therefore is not subject to the statutory presumption of nondischargeability.

The Court's own research has disclosed three reported decisions that have considered the issue of whether the phrase "cash advance" contained in § 523(a)(2)(C) includes a credit card balance transfer. In each of these decisions, the bankruptcy courts held that a credit card balance transfer does not constitute a § 523(a)(2)(C) cash advance. *See Cameron,* 219 B.R. at 536 ("[B]alance transfers are not cash advances."); *Poor,* 219 B.R.

requires the existing dollar amounts set forth in § 523(a)(2)(C) to be adjusted on April 1, 1998, and at each three-year interval ending April 1 thereafter, to reflect changes in the Department of Labor's most recent Consumer Price Index for urban consumers. Adjustments made pursuant to § 104 do not apply to cases commenced before the date of the adjustment. Bankruptcy Reform Act of 1994, Pub.L. No. 103–394 (October 22, 1994). The April 2001 adjustment to the dollar amount contained in § 523(a)(2)(C) increased the debt threshold from $1,075 to $1,150.

7. Courts have diverged on the issue of whether § 523(a)(2)(C)'s presumption shifts only the initial burden of going forward with the evidence or the ultimate burden of proof. *Compare Novus Servs., Inc. v. Cron (In re Cron),* 241 B.R. 1, 8 (Bankr.S.D.Iowa 1999) ("[T]he presumption transforms the burden into one of proving the debt is dischargeable and places that burden squarely on the shoulders

of the debtor.") *and AT & T Universal Card Servs. Corp. v. Acker (In re Acker),* 207 B.R. 12, 16 (Bankr.M.D.Fla.1997) ("Once a creditor has established the applicability of the presumption, ... the [debtor] must now show that the debt was not incurred in contemplation of bankruptcy, without the intent to repay.") *with Carroll & Sain v. Vernon (In re Vernon),* 192 B.R. 165, 171 (Bankr.N.D.Ill. 1996) ("The burden of proof is not shifted by the presumption, the ultimate risk of nonpersuasion remains throughout the proceedings upon the [creditor].") *and Norwest Fin. Consumer Disc. Co. v. Koch (In re Koch),* 83 B.R. 898, 902 (Bankr.E.D.Pa.1988) ("Although [§ 523(a)(2)(C)] establishes a presumption in favor of the creditor, the existence of this presumption does not shift the burden of proof from the creditor, it only shifts the initial burden of production to the debtor.").

at 339 ("[Debtor's] utilization of the balance transfer option offered her ... is without the scope of § 523(a)(2)(C)'s presumptive nondischargeability for cash advances."); *Norwest Bank of Iowa, N.A. v. Orndorff (In re Orndorff)*, 162 B.R. 886, 888 n. 2 (Bankr.N.D.Okla.1994), *overruled on different grounds by Household Credit Servs., Inc. v. Peterson (In re Peterson)*, 182 B.R. 877 (Bankr.N.D.Okla.1995), ("[U]se of an access check to pay the balance due on another card is not a cash advance and therefore § 523(a)(2)(C) does not apply.").

In *Orndorff*, the court rejected the creditor's contention that a credit card obligation incurred through use of an "access check"[8] less than two weeks before the debtor's Chapter 7 filing was nondischargeable under § 523(a)(2)(A), determining that the debt was not obtained through false pretenses. *Orndorff*, 162 B.R. at 888–90. In a footnote, the court disposed of the creditor's assertion that the § 523(a)(2)(C) presumption of nondischargeability applied, stating as follows: "[The creditor] also argued that its debt was nondischargeable under § 523(a)(2)(C). However, the Court held that use of an access check to pay the balance due on another credit card is not a cash advance and therefore § 523(a)(2)(C) does not apply." *Id.* at 888 n. 2. *Orndorff* sheds no light on how the court arrived at

its conclusion that a § 523(a)(2)(C) cash advance does not include a credit card balance transfer.

*Cameron*, like *Orndorff*, holds that § 523(a)(2)(C)'s presumption of nondischargeability does not apply to a debt arising from a credit card balance transfer. The *Cameron* court began its analysis by distinguishing a fresh advance of cash from a refinancing transaction, noting that: "Debtor never requested or received cash drawn against the credit limit of her ... account. Rather, Debtor accepted [the creditor's] offer to refinance existing balances on two other cards." *Cameron*, 219 B.R. at 536. The court added:

"Refinance" is defined as: "To finance again or anew; to pay off existing debts with funds secured from new debt. The discharge of an obligation with funds acquired through the creation of a new debt." Black's Law Dictionary 665 (6th ed.1990). This definition describes the transaction in the present case: Debtor paid off existing debts with preapproved funds secured from new debt. Refinancing of debt does not fall within the various categories of § 523(a)(2)(C).

*Id.* at 536 (citing *Beneficial of Missouri, Inc. v. Shurbier (In re Shurbier)*, 134 B.R. 922 (Bankr.W.D.Mo.1991); *Thorp Credit, Inc. v. Smith (In re Smith)*, 54 B.R. 299 (Bankr.S.D.Iowa 1985)).

---

**8.** The documents transmitted by credit card issuers to customers and potential customers to facilitate a transfer of credit card account balances have been variously referred to as "balance transfer checks," "balance transfer forms," "line of credit checks," or "access checks." *See Caraglior v. World Sav. & Loan (In re Caraglior)*, 251 B.R. 778, 781 & n. 9 (Bankr.D.Conn.2000) (noting that under cardholder agreement debtor could "write Balance Transfer Checks"); *Poor*, 219 B.R. at 334 (stating that debtor utilized a "Visa Balance Transfer Form"); *Schnall v. Marine Midland Bank*, No. 99 Civ. 0371(SHS), 1999 WL 498194, at * 1 (S.D.N.Y. July 14, 1999)

(noting that bank mailed a " 'balance transfer offer' " to cardholders that included "line of credit checks"); *Orndorff*, 162 B.R. at 888 n. 2 (referring to debtor's use of an "access check" to pay the balance due on another credit card). As noted above, Manning stated that he could not recall precisely how the Final Balance Transfer was made, testifying that he either requested the transfer telephonically or by completing a "check" he received from NCB. Therefore, it is unclear whether Manning used a "balance transfer check" or similar document to effect the Final Balance Transfer.

Although the *Cameron* court referred to "the plain meaning of the statute," it looked to the legislative history of § 523(a)(2)(C) for interpretative guidance, noting that "legislative intent is also significant in determining whether transfer of existing debt from one credit card to another is a cash advance." *Id.* at 536. The court concluded that the policy Congress sought to promote by enacting § 523(a)(2)(C) would not be served by holding that the debtor's eve-of-bankruptcy credit card balance transfer constituted a cash advance:

> In adding § 523(a)(2)(C) on cash advances and purchases of luxury items, Congress intended to address debtor conduct of "loading up," or going on a buying spree in anticipation of bankruptcy, by creating a rebuttable presumption to make such debt nondischargeable. No such buying spree occurred here. Debtor received no cash in hand in connection with the balance transfers. Rather, Debtor acquiesced to [the creditor's] ill-advised offer to transfer credit card balances that would have been discharged if Debtor had rejected the offer and filed for bankruptcy.

*Id.* at 536–37 (citation omitted).

*Poor* reaches the same result as *Cameron*, but begins with a different premise—

that the meaning of the phrase "cash advance" is ambiguous. *See Poor*, 219 B.R. at 336 ("The meaning of 'cash advance' for § 523(a)(2)(C) purposes is not crystalline."). Noting that "the Code provides no express definition" of the phrase "cash advance," the court reasoned that "[g]iven the rapid growth and diversification of financial credit services, the range of transactions that might be assayed to determine their character as § 523(a)(2)(C) 'cash advance[s]' is ever-expanding." *Id.* Having determined the meaning of the phrase "cash advance" to be unclear, the court turned to the legislative history of § 523(a)(2)(C).[9] Concluding, as did the *Cameron* court, that to characterize a balance transfer as a cash advance for purposes of applying § 523(a)(2)(C)'s presumption of nondischargeability would not be consistent with the policy underlying the statute, the court stated:

> [Debtor's] transfer of her ... card balance ... cannot fairly be characterized as fraudulent or as part of a pre-bankruptcy buying binge. It would pervert the statute's purpose to interpret "cash advance" so expansively as to bring [Debtor's] balance transfer within its scope.
>
> [Debtor] could not receive cash to spend as she pleased through completing the

---

**9.** The legislative history for § 523(a)(2)(C) states:

> Section 523 is amended and expanded to address a type of unconscionable or fraudulent debtor conduct not heretofore considered by the code—that of loading up. In many instances, a debtor will go on a credit buying spree in contemplation of bankruptcy. The new subsection (d) creates a rebuttable presumption that any debt incurred by the debtor within 40 days before the filing of the petition has been incurred under the circumstances that would make the debt nondischargeable. Only that portion of a debt which was incurred within the 40–day time period is subject to this presumption.

> *The burden is upon the debtor to demonstrate that the debt was not incurred in contemplation of discharge in bankruptcy and thus a fraudulent debt.* As the language makes clear, debts incurred for expenses reasonably necessary for support of the debtor and the debtors dependents are not covered by the presumption.

S.Rep. No. 65, 98th Cong., 1st Sess. 58 (1985) (emphasis added). In 1994, Congress extended the presumptive period from 40 days to 60 days. *See* H.R.Rep. No. 103–834, 103rd Cong., 2nd Sess. 40 (Oct. 4, 1994), U.S.Code Cong. & Admin.News 1994, p. 3336; 140 Cong.Rec. H10770 (Oct. 4, 1994).

balance transfer boxes on the [creditor's] application. The absence of ready cash may not be determinative, but it is significant.

Moreover, the balance transfer did not result in any increase in [the debtor's] overall debt. A balance transfer—be it accomplished through a form incorporated into the credit application (as it was here), a telephone call, or by use of one of the plethora of "access checks" that credit card issuers so readily provide their customers—is, ostensibly, an attempt at debt management.

*Id.* at 337–38 (citations and footnote omitted).

■■■ The Court concurs with Judge Haines' conclusion in *Poor* that the meaning of the phrase "cash advance" is unclear.[10] Webster's Third New International Dictionary (1993) defines the term "cash" as:

> ready money (as coin, specie, paper money, an instrument, token, or anything else being used as a medium of exchange) ...; *broadly:* bank deposits and certain readily negotiable paper (as checks, drafts, notes, bearer bonds, coupons) ... money or its equivalent paid immediately or promptly after purchasing.

Similarly, Black's Law Dictionary (7th ed.1999) contains the following definition for cash: "Money or its equivalent; usual-ly ready money .... currency or coins, negotiable checks, and balances in bank accounts." Thus, the term "cash" has been defined narrowly—as currency, coin, paper money—and more broadly to include bank deposits, checks, drafts, notes, bearer bonds, etc. *See, e.g., National Diamond Syndicate, Inc. v. United Parcel Serv., Inc.*, 897 F.2d 253, 257 (7th Cir.1990) (collecting cases applying a "multiplicity of definitions of the term 'cash' " and noting that "[c]ourt definitions of cash vary with the circumstances presented by a particular case").

To be sure, an argument may be made that when a debtor effects a balance transfer through use of a "balance transfer check" or similar document, he/she has received an advance of "cash" as that term is broadly defined. But as the *Cameron* and *Poor* courts concluded, the phrase "cash advance" need not be so broadly construed to achieve the legislative purpose that motivated enactment of § 523(a)(2)(C)—to prevent eve-of-bankruptcy credit buying sprees. *See Cameron*, 219 B.R. at 537; *Poor*, 219 B.R. at 337. And, as explained below, both the structure of the Code and a fundamental policy on which it is based—that honest debtors should receive a fresh start—counsel against a broad interpretation of the phrase "cash advance." Further, defining the phrase "cash advance" to include bal-

---

10. Judge Haines looked to the legislative history of § 523(a)(2)(C) only after concluding that the meaning of the phrase "cash advance" was not clear, *see Poor*, 219 B.R. at 336–38, which is in keeping with the well-established rule of statutory construction that resort to legislative history is proper only when a statute's language is ambiguous. *See Koenig Sporting Goods, Inc. v. Morse Road Co. (In re Koenig Sporting Goods, Inc.)*, 203 F.3d 986, 988–89 (6th Cir.2000) ("When a statute is ambiguous, we look to its purpose and may consider the statute's policy implications in determining what Congress intended."); *Nix-on v. Kent County*, 76 F.3d 1381, 1386 (6th Cir.1996) ("Our interpretation of legislative acts is limited, for '[i]f the statutory language is unambiguous, in the absence of a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.' ") (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 177, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993)). The *Cameron* court violated this cardinal rule by turning to the legislative history of § 523(a)(2)(C) despite its finding that the meaning of the phrase "cash advance" is plain.

ance transfers would not be consonant with federal, non-bankruptcy law regulating consumer lending. Finally, NCB's own treatment of the Final Balance Transfer suggests that the transaction should not be characterized as a cash advance.

As noted above, neither the word "cash" nor the phrase "cash advance" is defined in the Code. *See* 11 U.S.C. § 101. And the phrase "cash advance" is found only once in the Code—in § 523(a)(2)(C). But, elsewhere in the Code, where Congress intended to define the term "cash" broadly (as including more than currency), that intention is clearly expressed. For example, in § 363(a), the phrase "cash collateral" is defined as including "cash, negotiable instruments, documents of title, securities, deposit accounts, *or other cash equivalents ....*" *See* 11 U.S.C. § 363(a) (emphasis added). *See also* 11 U.S.C. § 541(b)(5) (excluding from the scope of property of the estate "cash or cash equivalents" from the sale of certain money orders). Had Congress intended § 523(a)(2)(C)'s presumption of nondischargeability to be applied to a broad range of prepetition transactions, it presumably would have included a more expansive definition of the term "cash" in this subsection (e.g., making the presumption applicable to debts arising from the debtor's receipt of an advance of cash or cash equivalents within the 60–day period). *Cf. Citicorp Nat'l Credit & Mortgage Servs. for Citibank, N.A. v. Welch (In re Welch)*, 208 B.R. 107, 111 (S.D.N.Y. 1997) (affirming bankruptcy court's determination that debtor needed to receive cash in hand "either through ATM withdrawals or by drafting checks for 'cash'" for the transaction to qualify as a § 523(a)(2)(C) cash advance). Moreover, if Congress intended to bring refinancing transactions within the ambit of § 523(a)(2)(C)'s presumption of nondischargeability, then a clear legislative

statement of that intent would be found in this subsection as it is in § 523(a)(2)(A) of the Code, which provides that debts "for money, property, services, or an extension, renewal, *or refinancing of credit*" are nondischargeable if obtained by false pretenses, a false representation, or actual fraud. 11 U.S.C. § 523(a)(2)(A) (emphasis added). Hence, the Code's structure suggests that the phrase "cash advance" should be construed narrowly.

■ Further, as the *Poor* decision notes, to read the phrase "cash advance" broadly would erode a bedrock principle of bankruptcy law—that exceptions to discharge must be narrowly construed in order to ensure that honest debtors receive a fresh start. *See Poor*, 219 B.R. at 336 ("Consistent with longstanding bankruptcy law principles, I will narrowly construe § 523(a)(2)(C)'s exception to discharge, favoring [the debtor's] fresh start."). *See also Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) ("[A] central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'") (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934)); *Meyers v. IRS (In re Meyers)*, 196 F.3d 622, 624 (6th Cir.1999) ("[E]xceptions to discharge are narrowly construed to promote the central purpose of the discharge: relief for the 'honest but unfortunate debtor.'") (quoting *Grogan*, 498 U.S. at 286–87, 111 S.Ct. 654); *Manufacturer's Hanover Trust Co. v. Ward (In re Ward)*, 857 F.2d 1082, 1083 (6th Cir. 1988) ("Exceptions to dischargeability are to be construed strictly."). In short, an expansive interpretation of the phrase "cash advance" is unnecessary to effectu-

ate the legislative purpose underlying § 523(a)(2)(C)—to discourage pre-bankruptcy credit binges—and would run counter to the well-established principle that exceptions to discharge must be narrowly construed in order to promote the fresh start policy.

Moreover, under federal law regulating credit card lending, a credit card cash advance and a credit card balance transfer are treated as separate and distinct transactions. The Truth in Lending Act ("TILA"),[11] 15 U.S.C. §§ 1601–1667e, requires credit card issuers to make certain disclosures prior to extending credit, *see* 15 U.S.C. § 1637(a), with each billing statement, *see* 15 U.S.C. § 1637(b), and in applications for credit cards, *see* 15 U.S.C. § 1637(c). The regulations promulgated by the Federal Reserve Board to implement these TILA requirements (*see* 12 C.F.R. pt. 226), generally termed "Regulation Z," require creditors to disclose the fees imposed on certain transactions and the method used to calculate customer balances. *See* 12 C.F.R. § 226.5a(b). Specifically, a credit card issuer must disclose "[e]ach periodic rate that may be used to compute the finance charge on an outstanding balance for purchases, *a cash advance, or a balance transfer,* expressed as an annual percentage rate . . . ." *See* 12 C.F.R. § 226.5a(b)(1) (emphasis added). Credit card issuers also are required to disclose the amount of any fees imposed for certain transactions, including a "[c]ash advance fee," defined as "[a]ny fee imposed for an extension of credit in the form of cash," *see* 12 C.F.R. § 226.5a(b)(8), as well as a "[b]alance transfer fee," defined as "[a]ny fee imposed to transfer an outstanding balance," *see* 12 C.F.R. § 226.5a(b)(11). Thus, the federal regulatory scheme governing consumer credit lending recognizes a clear distinction between a credit card cash advance and a balance transfer.

Nor does NCB's own billing statement characterize the Final Balance Transfer as a cash advance. In the November 1 Statement, the Final Balance Transfer is not described as a cash advance. Rather, the amount of the Final Balance Transfer is listed under the heading of "Purchases/Debits." *See* Joint Exhibit 2. An amount of $0 is listed in the column labeled "Cash Advances." *See id.* And the "Finance Charges Summary" contained in the November 1 Statement reads as follows:

| Transaction Type | Daily Periodic Rate | Corresponding Annual Percentage Rate | Finance Charge | Average Daily Balance |
|---|---|---|---|---|
| Purchases | .03832% | 13.99% | $ 6.43 | $ 579.09 |
| Cash Advances | .05767% | 21.05% | $ 0.00 | $ 0.00 |
| New Account Balance Transf. | .03832% | 13.99% | $ 2.70 | $ 243.49 |
| Promotional Rate | 0.2712% | 9.90% | $36.38 | $4,626.45 |

**11.** The TILA is one of a series of separate laws that together comprise the Consumer Credit Protection Act ("CCPA"), 15 U.S.C. §§ 1601–1693r. Section 523(a)(2)(C) draws upon the CCPA for the definitions of the terms contained in the phrase "an extension of consumer credit under an open end credit plan." *See* 11 U.S.C. § 523(a)(2)(C) (providing that "an extension of credit under an open end credit plan is to be defined for purposes of this subparagraph as it is defined in the Consumer Credit Protection Act").

*Id.* As Joint Exhibit 2 reflects, interest was imposed on the amount of the Final Balance Transfer at either the daily periodic "Promotional Rate" of .02712% or the daily periodic rate applicable to "New Account Balance Transf[ers]" (.03832%). The higher daily periodic rate for cash advances (.05767%) was not applied. *See id.* Thus, NCB's argument that the Final Balance Transfer should be deemed to be a cash advance for purposes of determining the applicability of § 523(a)(2)(C)'s presumption of nondischargeability flies in the face of its own treatment of the transaction.

To summarize, the Court concludes that the Final Balance Transfer does not constitute a cash advance within the meaning of § 523(a)(2)(C). As the *Cameron* and *Poor* courts determined, such a broad construction of the phrase "cash advance" is unnecessary to achieve Congress's goal of discouraging eve-of-bankruptcy credit sprees. Moreover, an expansive reading of § 523(a)(2)(C) is not suggested by the structure of the Code and would undermine the fundamental principle that exceptions to discharge must be narrowly construed "to promote the central purpose of the discharge: relief for the 'honest but unfortunate debtor.' " *Meyers,* 196 F.3d at 624 (quoting *Grogan,* 498 U.S. at 286–87, 111 S.Ct. 654). Finally, both federal law regulating credit card lending and NCB's own treatment of the Final Balance Transfer weigh against characterizing the transaction as a § 523(a)(2)(C) cash advance.

Because the Final Balance Transfer does not constitute a § 523(a)(2)(C) cash advance, Manning need not go forward with evidence to rebut the presumption of nondischargeability. The burden of proving by a preponderance of the evidence that Manning had no intention of repaying the Card Obligation when he incurred the debt rests with NCB.

## C. *False Representation*

To establish that a debt is nondischargeable under § 523(a)(2)(A):

a creditor must prove the following elements: (1) the debtor obtained money through a material representation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

*Rembert,* 141 F.3d at 280–81 (footnote omitted) (citing *Longo v. McLaren (In re McLaren),* 3 F.3d 958, 961 (6th Cir.1993)). In *Rembert,* the Sixth Circuit held that "[t]he use of a credit card represents either an actual or implied intent to repay the debt incurred." *Rembert,* 141 F.3d at 281. Whether a debtor made this implied representation with "fraudulent intent must be determined from the totality of the circumstances and should not be implied solely based on use of a credit card when there is no immediate ability to repay." *Providian Bancorp v. Shartz (In re Shartz),* 221 B.R. 397, 400 (6th Cir. BAP 1998) (citing *Rembert,* 141 F.3d at 281–82).

Here, the parties have stipulated that the only issue in dispute is whether Manning intended to repay the Card Obligation at the time he made the Final Balance Transfer. Thus, if the Card Obligation is to be excepted from discharge under § 523(a)(2)(A), NCB must prove by a preponderance of the evidence that Manning did not have the intent to repay the debt when he initiated the Final Balance Transfer. *Rembert,* 141 F.3d at 281 ("[T]he proper inquiry to determine a debtor's fraudulent intent is whether the debtor subjectively intended to repay the debt.");

*Chevy Chase Bank FSB v. Kukuk (In re Kukuk)*, 225 B.R. 778, 786 (10th Cir. BAP 1998) ("An implied representation of intent to repay will be fraudulent if the credit card issuer demonstrates that at the time the debtor used a credit card he or she had no intent to repay the debt incurred.") (citing Restatement (Second) of Torts (1976) at § 530(a)).

 The task of proving a debtor's state of mind at the time a credit card is used is a very difficult one. *See, e.g., AT & T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 409 (5th Cir. 2001) ("A debtor rarely will admit card-debt is incurred with the intention of *not* paying it. . . ."); *Rembert*, 141 F.3d at 282 ("[A] subjective analysis of a debtor's fraudulent intent is extremely difficult to establish. Clearly, debtors have an incentive to make self-serving statements and will rarely admit an intent not to repay."); *Cameron*, 219 B.R. at 537 ("Direct proof of an individual's actual intent is difficult if not impossible to obtain. . . ."). In evaluating a debtor's subjective intent at the time a credit card is used, a number of courts have considered the following 12 factors enumerated by the Ninth Circuit Bankruptcy Appellate Panel in *Citibank South Dakota, N.A. v. Dougherty (In re Dougherty)*, 84 B.R. 653, 657 (9th Cir. BAP 1988):

(1) The length of time between the charges made and the filing of bankruptcy;

(2) Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;

(3) The number of charges made;

(4) The amount of the charges;

(5) The financial condition of the debtor at the time the charges were made;

(6) Whether the charges were above the credit limit of the account;

(7) Whether the debtor made multiple charges on the same day;

(8) Whether or not the debtor was employed;

(9) The debtor's prospects for employment;

(10) Financial sophistication of the debtor;

(11) Whether there was a sudden change in the debtor's buying habits; and

(12) Whether the purchases were made for luxuries or necessities.

 While the *Dougherty* factors may be helpful in determining the debtor's state of mind, their application should not necessarily be outcome determinative. *See Rembert*, 141 F.3d at 282 (noting that " 'factor-counting' is inappropriate when applying a subjective standard"); *American Express Travel Related Servs. Co. Inc. v. Hashemi (In re Hashemi)*, 104 F.3d 1122, 1125 (9th Cir.), *cert. denied*, 520 U.S. 1230, 117 S.Ct. 1824, 137 L.Ed.2d 1031 (1997) ("[The *Dougherty* ] factors are non-exclusive; none is dispositive, nor must a debtor's conduct satisfy a minimum number in order to prove fraudulent intent."); *Kukuk*, 225 B.R. at 787 ("Focusing on the circumstances of a particular case, and not a laundry list of factors, is required if the rule that the creditor has the burden to prove each element of fraudulent misrepresentation and nondischargeability under § 523(a)(2)(A) is to be heeded."). Bearing in mind that the *Dougherty* factors are merely guidelines and should not to be applied as a litmus test, the Court will consider each of these factors as it seeks to "determine whether all the evidence leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent." *Chase Manhattan Bank v. Murphy (In re Murphy)*, 190 B.R. 327, 334 (Bankr.N.D.Ill.1995).

### 1. The length of time between the charges made and the filing of bankruptcy

Based on Manning's unrebutted testimony that he requested the Final Balance Transfer on October 4, 2000, 30 days elapsed between the date the Card Obligation was incurred and the Petition Date.

### 2. Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made

Manning had an initial consultation with his bankruptcy attorney approximately seven months before the date of the Final Balance Transfer. His second meeting with his counsel occurred 12 days after the date of the Final Balance Transfer. NCB makes much of the fact that Manning consulted with his bankruptcy attorney before he made the Final Balance Transfer. But Manning's testimony established that, after his initial meeting with counsel, he decided to attempt to continue making at least minimum monthly credit card payments until his alimony/support obligations terminated in 2002. Indeed, as Joint Exhibit 3 reflects, Manning made at least seven monthly payments to NCB—totaling $2,735.59—after he met with his bankruptcy attorney in October 2000. The fact that Manning later abandoned this strategy and made the decision to seek bankruptcy relief after a second meeting with his attorney, which took place after the Final Balance Transfer was made, does not establish fraud on his part.

The mere 12–day lapse of time between the date of the Final Balance Transfer and Manning's second meeting with his bankruptcy attorney is somewhat more troubling. The timing of this sequence of events, in NCB's view, establishes that the Debtor had the requisite fraudulent intent when the debt was incurred. Equally plausible, however, is Manning's testimony that the Card Obligation was not incurred in contemplation of bankruptcy. Rather, according to Manning, the Final Balance Transfer was made in response to NCB's offer and in keeping with his plan to continually shift credit card balances to the account with the lowest interest rate. His decision to seek bankruptcy relief, Manning testified, came after he incurred the Card Obligation and was made at the time he consulted with counsel.

Having assessed Manning's credibility as a witness, the Court concludes that he did not make the decision to seek bankruptcy relief, and thus form the intention not to repay NCB, until after he incurred the Card Obligation. *See Star Bank, N.A. v. Stearns (In re Stearns)*, 241 B.R. 611, 625–26 (Bankr.D.Minn.1999) ("In purest isolation, the fact that the [debtor] accrued more than $8,700.00 in charges over a period of less than four months immediately before her bankruptcy filing suggests a deliberate 'loading up' in contemplation of bankruptcy. The sequence of charging and filing, however, could be attributed as easily to an irresponsible but not-fraudulent spree, a sudden realization of insolvency, and even an innocent panic."); *Orndorff*, 162 B.R. at 888 (holding dischargeable a debt arising from balance transfer made less than two weeks prior to bankruptcy filing, based on court's finding that debtor believed he had ability to pay creditor at time debt was incurred notwithstanding the fact that "[w]ithin days of writing the access check and after consultation with his son, [d]ebtor came to the conclusion that his increasing blindness prevented him from further operating [his] hay and cattle business").

### 3. The number of charges made

In the 60 days preceding the Petition Date, the only charges made on the NCB

Visa account were the Final Balance Transfer and two regular monthly charges of $21.95 for internet service.

#### 4. The amount of the charges

Manning's charges totaled $7,105.33 in the 60 days before the Petition Date—the $7,061.43 Final Balance Transfer (which was solicited and approved by NCB) plus a total of $43.90 in internet service charges.

#### 5. The financial condition of the debtor at the time the charges were made

NCB urges the Court to infer fraudulent intent from Manning's financial condition at the time the Card Obligation was incurred. According to NCB, Manning's financial condition had been steadily deteriorating since his divorce and did not improve after he first met with his bankruptcy counsel in March 2000. Given his financial straits, NCB contends that Manning must have known he could not possibly repay the Card Obligation at the time the Final Balance Transfer was made.

By his own admission, Manning had been experiencing financial difficulties since his divorce in 1998. He conceded on cross-examination that he occasionally failed to make minimum monthly payments on his credit card accounts. Manning also testified that in order to increase his monthly disposable income he considered a second job (which he was unable to secure due to his work schedule at Home Towne) and requested, but did not receive, a raise from his employer.

A debtor's financial condition at the time of credit card use is one factor that courts consider in determining whether an implied representation of intent to repay was fraudulently made. *See Kukuk,* 225 B.R. at 787 ("[O]ne of the factors considered by the courts in determining whether fraudulent intent exists under the

totality of the circumstances test is the debtor's financial condition at the time that the credit card was used, or the debtor's ability to pay the debt incurred."). As the Sixth Circuit noted in *Rembert,* however, in determining whether scienter exists, courts should not rely solely on the debtor's financial condition at the time of credit card use:

> [T]he focus should not be on whether the debtor was hopelessly insolvent at the time he made the credit card charges. A person on the verge of bankruptcy may have been brought to that point by a series of unwise financial choices, such as spending beyond his means, and if ability to repay were the focus of the fraud inquiry, too often would there be an unfounded judgment of non-dischargeability of credit card debt. Rather, the express focus must be solely on whether the debtor maliciously and in bad faith incurred credit card debt with the intention of petitioning for bankruptcy and avoiding the debt. A finding that a debt is non-dischargeable under 523(a)(2)(A) requires a showing of actual or positive fraud, not merely fraud implied by law.... While we recognize that a view to the debtor's overall financial condition is a necessary part of inferring whether or not the debtor incurred the debt maliciously and in bad faith, ... the hopeless state of a debtor's financial condition should never become a substitute for an actual finding of bad faith.

*Rembert,* 141 F.3d at 281 (quoting *Anastas v. American Sav. Bank (In re Anastas),* 94 F.3d 1280, 1285–86 (9th Cir.1996)). *Accord Mercer,* 246 F.3d at 408 ("[D]ebtor's financial condition at card-use is only *one* of many factors to consider, and should *not* be the *sole basis* for finding fraudulent intent."); *Kukuk,* 225 B.R. at 787 ("[Debtor's financial condition,] like all of the oth-

er factors stated above, should not be dispositive on the issue of fraudulent intent, but may be a necessary part of inferring whether or not the debtor incurred the debt with no intent of repaying it."); *Murphy,* 190 B.R. at 332 n. 6 ("Intent to pay is not synonymous with ability to pay; at most, the latter is merely one factor to be considered in determining whether the debtor intended to repay. Alone, financial inability to repay does not establish fraudulent intent."). Further, in determining whether a debtor had the ability to pay a credit card obligation, "payment" should be defined as paying the minimum amount required under the credit card agreement. *See Rembert,* 141 F.3d at 281 ("To measure a debtor's intention to repay by her ability to do so, without more, would be contrary to one of the main reasons consumers use credit cards: because they often lack the ability to pay in full at the time they desire credit."); *Kukuk,* 225 B.R. at 787 ("[Because] many credit card agreements only require a debtor to make minimum monthly payments. . . .[,] in considering ability to pay, the court should determine whether the debtor had the ability to make the minimum monthly payment at the time the debt was incurred."); *Murphy,* 190 B.R. at 332 ("One of the principal reasons people rely on credit is a present lack of ability to pay.").

Here, the evidence does not establish that Manning's financial condition at the time he made the Final Balance Transfer was so dire that fraudulent intent should be inferred. Manning conceded that he occasionally failed to make the minimum monthly payments on the NCB Visa and other credit card accounts. But Manning made payments in excess of the minimum amount due on the NCB Visa account in six of the ten months preceding the Petition Date. *See* Joint Exhibit 3. And in March 2000, Manning paid off the account and maintained a credit balance of $43.61

as of May 2000. *See id.* Manning's payment history apparently was not deemed unsatisfactory by NCB given its decision to solicit the Final Balance Transfer and raise Manning's credit limit from $7,000 to $8,000 so that the transfer could be made. There is no question that Manning struggled with his finances after his divorce. Nor is there any doubt that Manning used his credit cards in order to attempt to buy time until his alimony/support obligations terminated. But NCB simply has failed to establish that Manning's financial prospects were so hopeless at the time that the Final Balance Transfer was made that fraudulent intent should be inferred.

### 6. Whether the charges were above the credit limit of the account

NCB raised Manning's credit limit from $7,000 to $8,000 to enable him to make the Final Balance Transfer.

### 7. Whether the debtor made multiple charges on the same day

In October 2000, the month the Final Balance Transfer was effected, no multiple charges were made. And during the ten-month period before the Petition Date, Manning made multiple charges on a given day only twice. On each of these occasions, two charges totaling less than $100 were made. *See* Joint Exhibit 3.

### 8. Whether the debtor was employed

Manning was employed at Home Towne when the Final Balance Transfer was made.

### 9. The debtor's prospects for employment

Not applicable: Manning was employed when the Card Obligation was incurred.

### 10. Financial sophistication of the debtor

No evidence was offered to establish Manning's level of financial sophistication. The timing of the Final Balance Transfer in relation to the Petition Date—which raised the possible applicability of § 523(a)(2)(C)' presumption of nondischargeability—suggests a lack of financial sophistication. *See Mercer*, 246 F.3d at 421 ("Obviously, a dishonest but patient debtor who intends to incur card-debt in contemplation of discharge easily could avoid this [§ 523(a)(2)(C)'s] 60–day [presumptive] period."); *Cameron*, 219 B.R. at 538 ("If this debtor had been financially sophisticated, she would have known not to transfer dischargeable debts to [the creditor]. All she did was make matters worse for herself by raising red flags....").

### 11. Whether there was a sudden change in the debtors' buying habits

Not applicable. *See Cameron*, 219 B.R. at 538 (holding that this factor does not apply in context of a balance transfer transaction "because [d]ebtor did not acquire money, goods, or services").

### 12. Whether the purchases were made for luxuries or necessities

Not applicable.

 In sum, at least 9 of the 12 *Dougherty* factors weigh against a finding of fraudulent intent on Manning's part. And as explained above, neither the timing of the Final Balance Transfer, Manning's consultation with his bankruptcy attorney approximately seven months before it was made, Manning's financial condition at the time the Card Obligation was incurred, nor the combination of these factors is sufficient, in the Court's view, to establish scienter. But as *Rembert* teaches, in divining a debtor's subjective intent, a careful analysis of all the facts and circumstances of a particular case, rather than "factor-counting," is required. *See Rembert*, 141 F.3d at 281 (" '[F]actor-counting' is inappropriate when applying a subjective standard[.]"); *Murphy*, 190 B.R. at 334 ("[F]actor-counting exercise turns the job of fact-finding on its head.... [T]he fact-finding process is only clouded by copying a list of factors from other cases and weighing evidence according to how bow well it matches that list."). Central to this analysis is the Court's assessment of a debtor's demeanor and credibility. *See Mercer*, 246 F.3d at 409 ("[T]he bankruptcy court must make a credibility determination, considering the debtor's testimony, along with other objective circumstantial evidence of the debtor's subjective intent."); *Kukuk*, 225 B.R. at 786 ("A finding regarding fraudulent intent, therefore, will be determined on a case-by-case basis, with the ... demeanor and credibility of the witness playing a very large role.").

NCB argues that Manning's fraudulent intent may be inferred from the timing of the Final Balance Transfer, his financial condition when it was made, and the fact that he consulted with his bankruptcy attorney months before the Card Obligation was incurred. These factors, in NCB's estimation, establish that Manning incurred the Card Obligation in contemplation of obtaining a bankruptcy discharge. Manning, on the other hand, maintains that notwithstanding his previous meeting with his attorney, and the admittedly problematic timing of the Final Balance Transfer, he did not decide to seek bankruptcy relief—and thus resolve not to pay the Card Obligation—until he met with counsel.

Having assessed Manning's demeanor as a witness, the Court finds his testimony to be credible. Manning's strategy was to

attempt to keep his head above water—by making minimum credit card payments and transferring account balances—until his alimony/support obligation terminated in 2002. He was successful in doing so for over two years following his divorce. There was nothing fraudulent about this course of conduct. *See General Elec. Capitol Consumer Card Co. v. Janecek (In re Janecek),* 183 B.R. 571, 575–76 (Bankr. D.Neb.1995) (holding that debtor's ten-year practice of using credit cards to keep himself afloat demonstrated that the two cash advances at issue were not part of a scheme to deceive creditors by accumulating unsecured debt with no intent to repay). Responding to NCB's solicitation, Manning made the Final Balance Transfer and incurred the Card Obligation in accordance with his practice of shifting account balances to the credit card with the lowest interest rate. The Court concludes that Manning did not form the intention to seek bankruptcy relief, and thus not repay the Card Obligation, until he consulted with his attorney on October 16, 2000. Thus, based on the totality of the circumstances, the Court concludes that Manning did not intend to deceive NCB at the time he incurred the Card Obligation.

Nor does the evidence show that Manning's representation of his intent to repay NCB—which, again, is implied from his use of the Visa card to effect the Final Balance Transfer—was made with reckless disregard for the truth. As the court noted in *Kukuk:*

> A reckless disregard for the truth of a representation, such as an implied representation that the debtor intends to repay debt incurred through the use of a credit card, may constitute fraud. However, "reckless disregard" should be very narrowly interpreted.... A "line is to be drawn between an intent to mislead and mere negligence. An honest belief, however unreasonable, that the

representation is true and the speaker has information to justify it [has been] held ... to be no sufficient basis for deceit." A debtor's unreasonably optimistic view that he or she could repay the debt when it was incurred, therefore, does not constitute fraud if the debtor intended to repay the debt when it was incurred.

*Kukuk,* 225 B.R. at 787–88 (citation omitted) (quoting W. Page Keeton et al., *Prosser and Keeton on Torts,* § 107 at 742 (5th ed.1984)). *See also Anastas,* 94 F.3d at 1286 ("[C]ourts faced with the issue of dischargeability of credit card debt must take care to avoid forming the inquiry under section 523(a)(2)(A) as whether the debtor recklessly represented his financial condition. The correct inquiry is whether the debtor either intentionally or with recklessness as to its truth or falsity, made the representation that he intended to repay the debt."); *Karelin v. Bank of Am. Nat'l Trust & Sav. Ass'n (In re Karelin),* 109 B.R. 943, 948 (9th Cir. BAP 1990) ("A substantial number of bankruptcy debtors incur debts with hopes of repaying them that could be considered unrealistic in hindsight.").

The Court has determined that Manning intended to repay NCB at the time he made the Final Balance Transfer and did not decide to seek bankruptcy protection until he later met with his attorney. Thus, when Manning made the implied representation of intent to repay NCB, he did not do so with a reckless disregard for its truth or falsity.

### D. *Credit Card Kiting*

The Court need not dwell at length on NCB's assertion that, by making the series of prepetition balance transfers listed above at pages 4 and 5, Manning engaged in a fraudulent credit card kiting

scheme. Because Manning intended to repay the Card Obligation when he made the Final Balance Transfer, his conduct does not constitute credit card kiting as defined in the case law.

The leading decision involving a § 523(a)(2)(A) dischargeability challenge based on an alleged credit card kiting scheme is *Citibank (South Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082 (9th Cir.1996). There, the debtor, who had earned approximately $24,000 a year as a car lease consultant for a bank, injured his back and became unemployed. After suffering the injury, the debtor's income was limited to $1,200 per month in disability compensation. His monthly expenses amounted to $3,300. While unemployed, the debtor used 26 credit cards to maintain minimum monthly payments of approximately $2,000. *Id.* at 1085. Before filing for bankruptcy relief, the debtor used a credit card issued by Citibank (which challenged the dischargeability of the debtor's $22,567.79 debt) to finance a trip to visit his family in Pakistan and a $1,000 gambling spree in Las Vegas. *Id.* at 1085–86. The debtor's schedules listed $141,000 in unsecured debt, consisting primarily (over $100,000) of amounts due on his credit cards. *Id.* at 1086.

The Ninth Circuit affirmed the bankruptcy court's judgment in favor of Citibank, concluding that the debtor had engaged in a fraudulent kiting scheme. The *Eashai* court described credit card kiting as follows:

> In the case of credit card kiting, the debtor makes a false representation: 1) by creating the facade that all of his accounts are in good standing; and 2) by failing to disclose to the creditor his intent not to pay his credit card debt. This facade gives the debtor the appearance of an honest debtor, who is servicing his credit card debt in a timely manner by making minimum payments each month. Thus, the kiting scheme enables a dishonest debtor to hide his fraudulent intentions and engage in a spending spree which results in increasing amounts of credit card debt.
>
> . . . .
>
> The credit card kiter conceals his wrongful intent and fails to disclose to the creditor that he has no intention of paying his debt.

*Id.* at 1088–89. The Ninth Circuit explained that simply by making minimum payments with a cash advance from another credit card a debtor does not engage in fraudulent conduct. *Id.* at 1089. To constitute fraud, "[t]his action on the part of the debtor must also be coupled with a lack of intent to repay the debt." *Id.* at 1090. The court added that "a credit card kiter is easily distinguishable from a bad luck debtor. A credit card kiter manipulates the credit card system to gain money, property, and services with no intention of ever paying for them." *Id.*

As *Eashai* makes clear, the hallmark of a fraudulent credit card kiting scheme is "lack of intent to repay" the debt incurred. *Id.* Having concluded that Manning intended to repay NCB when he incurred the Card Obligation, and that the balance transfers were made in order to gain time until his alimony/support obligations terminated, Manning's conduct cannot constitute credit card kiting as defined in *Eashai. See AT & T Universal Card Servs. Corp. v. Searle (In re Searle)*, 223 B.R. 384, 392 (D.Mass.1998) ("[B]ecause the Bankruptcy Court found that Searle intended to repay the cash advances when he took them, his conduct does not constitute credit card kiting as defined by the Ninth Circuit."); *Huntington Nat'l Bank v. Lippert (In re Lippert)*, 206 B.R. 136, 141 (Bankr. N.D.Ohio 1997) ("In this case, ... the Debtor did not make only the minimum

monthly payments on his credit cards. He used advances from one card to pay in full the indebtedness on another card. Although that practice may have permitted the Debtor to postpone the day of reckoning, it does not appear designed to enable him to pyramid debts he did not intend to pay.").

Moreover, this case bears no resemblance to the egregious fact pattern presented in *Eashai*. Here, Manning listed a total of three unpaid credit card accounts—amounting to less than $15,000—in his schedule of liabilities. And there is no evidence that Manning used the balance transfers either to go on a spending spree or "pyramid debts he did not intend to pay." *Lippert*, 206 B.R. at 141. Indeed, the Final Balance Transfer did not increase Manning's overall indebtedness. Rather, Manning refinanced existing debt, merely substituting the identity of his creditors. The evidence adduced by NCB at trial thus falls well short of establishing that Manning engaged in a fraudulent credit card kiting scheme.

### V. *Conclusion*

For the foregoing reasons, the Court finds that the Card Obligation was not obtained through a false representation by Manning. The Card Obligation is therefore not excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A). A judgment in accordance with this Memorandum Opinion will be entered separately.

IT IS SO ORDERED.