**In re Kevin/Carley BRUMBAUGH, Debtors.**

**Chase Bank, Plaintiff,**

**v.**

**Carley Brumbaugh, Defendant.**

**No. 06–3639.**

United States Bankruptcy Court, N.D. Ohio.

Oct. 3, 2007.

Richard J. Szczepaniak, Toledo, OH, for Plaintiff.

Patti Baumgartner–Novak, Findlay, OH, for Defendants.

### MEMORANDUM OPINION AND DECISION

RICHARD L. SPEER, Bankruptcy Judge.

This cause comes before the Court after a Trial on the Plaintiff's Complaint to Determine Dischargeability of Debt. The Plaintiff's action is brought pursuant to the statutory exception to dischargeability set forth in 11 U.S.C. § 523(a)(2). At the conclusion of the Trial, the Court deferred ruling on the matter so as to afford the time to thoroughly consider the evidence as well as the arguments made by the Parties. The Court has now had this opportunity and finds, for the reasons set forth herein, that the Plaintiff's Complaint should be Dismissed.

### FACTS

On September 7, 2006, the Debtors filed a petition in this Court for relief under Chapter 7 of the United States Bankruptcy Code. At the time of their filing, the Debtor, Carley Brumbaugh, maintained a credit-card account with the Plaintiff, Chase Bank USA. The Plaintiff, through the instant action, seeks a determination that all amounts due and owing on this account should be held to be a nondischargeable debt. The relevant facts giving rise to this matter are now set forth.

The Debtors, Kevin and Carley Brumbaugh, are former husband and wife. They separated in May of 2006 and, according to their testimony, decided to get a divorce in the first week of July of 2006. On July 31, 2006, the Debtors went to see an attorney regarding the termination of their marriage. The Debtors testified that at this meeting the subject of bankruptcy was first broached.

On August 9, 2006, the Debtors sought out legal counsel for the specific purpose of filing for bankruptcy. On September 7, 2006, the Debtors then filed a petition in this Court for relief under Chapter 7 of the United States Bankruptcy Code. In their petition, the Debtors made these relevant financial disclosures.

First, the Debtors set forth that they had a combined net monthly income of $3,954.68. This income was derived solely from the Debtors' respective places of employment: Mr. Brumbaugh, as a sales representative, with a gross monthly salary of $2,277.00, netting $1,711.77 per month; Ms. Brumbaugh, as a salon manager, with a gross monthly salary of $2,462.51, netting $2,242.91 per month. Against their income, the Debtors, who were living apart at the time of the filing of their bankruptcy petition, set forth $4,017.37 in necessary monthly expenditures to support their separate households.

For liabilities, the Debtors disclosed $142,968.54 of secured debt and $71,745.18 in unsecured obligations. The secured debt stems primarily from a mortgage held against the Debtors' former marital residence, which the Debtors have since surrendered through the bankruptcy process. With the exception of a student-loan obligation owed by Ms. Brumbaugh in the amount of $26,143.00, the Debtors' unsecured obligations are comprised almost exclusively of credit-card balances including that owed to the Plaintiff.

At the time they filed their bankruptcy petition, the balance owed by Ms. Brumbaugh on her credit-card account with the Plaintiff stood at $17,686.70. This account was opened by Ms. Brumbaugh on June 17, 2006, 82 days prior to the Debtors' bankruptcy filing, after she received a solicitation from the Plaintiff through the mail. To open the account, Ms. Brumbaugh was required to fill out an application, which she did over the internet. In this application, Ms. Brumbaugh disclosed that she had a yearly income of $60,000.00. (Joint Ex. 1).

Immediately after opening the account, Ms. Brumbaugh made charges totaling $17,889.70. These charges consisted of three balance transfers, aggregating $ 17,-171.98, and various retail-credit transactions, totaling $810.77. The first balance transfer, for $9,671.98, occurred on June 24, 2006, 75 days before the filing of the Debtors' bankruptcy. The second and third balance transfers, totaling $7,500.00, both occurred six days later, on June 30, 2006.

The $727.72 in retail-credit transactions took place between June 25, 2006 and August 1, 2006. Included among these transactions were purchases at restaurants, as well as these particular transactions: (1) a charge of $192.15 from "Corey's Mulch and More"; and (2) a $145.00 purchase of services on August 2, 2006, at "Anthony Wayne Dental." Between July 31, 2006 and August 10, 2006, Ms. Brumbaugh made three small payments, in the amount of $357.00, on the Plaintiff's account. (Pl. Ex. A; Joint Ex. 2).

## LAW

### § 523. Exceptions to discharge

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title [11 USCS § 727, 1141, 1228(a), 1228(b), or 1328(b)] does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(C)(i) for purposes of subparagraph (A)—

(I) consumer debts owed to a single creditor and aggregating more than $550 for luxury goods or services incurred by an individual debtor on or within 90 days before the order for relief under this title are presumed to be nondischargeable; and

(II) cash advances aggregating more than $825 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within 70 days before the order for relief under this title, are presumed to be nondischargeable;

## DISCUSSION

The Plaintiff brings this cause to determine the dischargeability of a debt owed by the Debtor, Carley Brumbaugh. Proceedings brought to determine the dischargeability of a particular debt are deemed to be core proceedings pursuant to 28 U.S.C. § 157(b)(2)(I). As a core pro-

ceeding, this Court has been conferred with the jurisdictional authority to enter a final order in this matter. 28 U.S.C. § 157(b)(1).

■ The Plaintiff's complaint to determine dischargeability is brought pursuant to 11 U.S.C. § 523(a)(2)(A). In overall terms, this section excepts from discharge any debt which arises as the result of the fraudulent acts of the debtor. The function of this provision is to assist in implementing one of the fundamental pillars of bankruptcy jurisprudence: that bankruptcy relief should only be afforded to the honest, but unfortunate debtor. *Cohen v. de la Cruz*, 523 U.S. 213, 217, 118 S.Ct. 1212, 1216, 140 L.Ed.2d 341 (1998).

■ In order to sustain a finding of nondischargeability under § 523(a)(2)(A), these four elements must exist: (1) a material misrepresentation which the debtor knew, at the time, to be false or which was made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) the creditor's reliance was the proximate cause of its loss. *Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 280–81 (6th Cir.1998); *Citibank v. Stephens (In re Stephens)*, 302 B.R. 227, 230 (Bankr.N.D.Ohio 2003). As is often the case in an action brought under § 523(a)(2)(A), the only material issue presented to the Court at the Trial held in this matter concerned the existence of the first and second elements: whether, with the intent to deceive, the Debtor, Ms. Brumbaugh, knowingly or with reckless disregard as to its truth made a materially false representation to the Plaintiff.

■ In *In re Rembert,* the Sixth Circuit set forth that a "finding that a debt is non-dischargeable under 523(a)(2)(A) requires a showing of actual or positive fraud, not merely fraud implied by law." 141 F.3d at 281, *citing Anastas v. Ameri-*

*can Savings Bank (In re Anastas)*, 94 F.3d 1280, 1285–86 (9th Cir.1996). The first and second elements of § 523(a)(2)(A) go to the essence of actual fraud: that a person, acting with a culpable state of mind, deceives another. BLACK'S LAW DICTIONARY 660 (6th ed.1990). For this, the Court in *In re Rembert* further held that, for purposes of § 523(a)(2)(A), the proper inquiry is a subjective one. 141 F.3d at 281. Specifically, the question is whether, at the time the debt is incurred, "the debtor subjectively intended to repay the debt." *Id.*

■ A subjective approach,—as opposed to an objective, reasonable person standard—requires that the trier-of-fact focus solely on the individual characteristics of the debtor, meaning that traits such as ignorance, incompetency and ineptness may, if established, serve as a valid defense to a § 523(a)(2)(A) action. *Mack v. Mills (In re Mills)*, 345 B.R. 598, 604 (Bankr.N.D.Ohio 2006). Thus, of utmost importance in any fraudulent intent analysis is the credibility the Court attaches to the testimony of the debtor and any other witnesses called to testify. Yet, like with an objective approach, a subjective approach still permits, and practicably speaking will require the use of circumstantial evidence to ascertain a debtor's intentions because rarely, if ever, will a debtor actually admit to acting in a fraudulent manner. *EDM Machine Sales Inc. v. Harrison (In re Harrison)*, 301 B.R. 849, 855 (Bankr.N.D.Ohio 2003).

■ For purposes of § 523(a)(2)(A), the character of the circumstantial evidence will often focus on those traditional indicia, known as badges of fraud, used to determine intent *e.g.,* suspicious timing of events. *Id.* Where, as here, the use of a credit card is at issue, the Court in *In re Rembert* provided that the following badges could be helpful: (1) the length of

time between the charges made and the filing of bankruptcy; (2) whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made; (3) the number of charges made; (4) the amount of the charges; (5) the financial condition of the debtor at the time the charges are made; (6) whether the charges were above the credit limit of the account; (7) whether the debtor made multiple charges on the same day, (8) whether or not the debtor was employed; (9) the debtor's prospects for employment; (10) financial sophistication of the debtor; (11) whether there was a sudden change in the debtor's buying habits; and (12) whether the purchases were made for luxuries or necessities. 141 F.3d at 282, fn. 3.

Looking now at the evidence in this case as a whole, it is impossible not to see strong inferences of fraud, with there existing a number of the badges of fraud as set forth in *In re Rembert*. To begin with, even a cursory observer could not help but notice that Ms. Brumbaugh wasted no time in incurring a substantial amount of debt in the time period immediately leading up to her bankruptcy filing. Just 82 days passed between the time she opened her account with the Plaintiff and the time she fried her petition for bankruptcy relief. Furthermore, this window of time is compressed even further, thereby becoming even more suspect, when other events are considered.

First, the great majority of the credit extended to Ms. Brumbaugh—specifically, the $17,889.70 in cash advances—took place over only six days and as close to 69 days before she sought bankruptcy relief. Additionally, Ms. Brumbaugh continued to use the Plaintiffs credit card for retail transactions up until August 2, 2006, just 36 days before she filed her bankruptcy petition. Other disconcerting aspects to this case also exist.

Of particular note, it did not go unnoticed to the Court that some of Ms. Brumbaugh's retail charges were made for nonessentials such as eating out at restaurants. It also did not go unnoticed that, while using the Plaintiff's credit card, Ms. Brumbaugh readily admitted that her financial situation was anything but solid. What makes this especially troublesome is that Ms. Brumbaugh, being in a managerial position, cannot be viewed as a completely unsophisticated debtor.[1] Hence, Ms. Brumbaugh could not have completely blind to the risks she was taking by seeking an extension of credit from the Plaintiff.

But as it again regards the timing of events, what particularly stands out for the Court is the existence of the second badge of fraud set forth in *In re Rembert:* whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made. In this matter, Ms. Brumbaugh, by her own admission, first became aware of bankruptcy as a possibility on July 31, 2006, when she and her now ex-husband first saw an attorney regarding their marriage and financial situation. Yet, despite this knowledge,

---

1. Evidence in this case was also introduced that on her credit application with the Plaintiff, Ms. Brumbaugh made a misrepresentation regarding her income. Specifically, Ms. Brumbaugh represented that she, alone, had a gross annual salary of $60,000.00, when in truth this figure included both her income and that of her now ex-husband, the Debtor, Kevin Brumbaugh. However, insofar as it concerns an action under § 523(a)(2)(A), consideration of this misrepresentation, which concerns Ms. Brumbaugh's financial condition, is expressly forbidden.' *Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert),* 141 F.3d 277, 281 (6th Cir.1998) ("the language of § 523(a)(2)(A) expressly prohibits using a 'statement respecting the debtor's or an insider's financial condition' as a basis for fraud.").

Ms. Brumbaugh continued thereafter to use the Plaintiffs credit card, in particular, making a $145.00 purchase of services on August 2, 2006 to "Anthony Wayne Dental."

■ In response, Ms. Brumbaugh explained that this charge was made out of necessity because she needed to see the dentist. However, while this statement may very well be true, it misses the mark. The use to which one puts a debt, although potentially bearing on matters concerning morality and ethics, does not alter the foundational issue upon which fraud under § 523(a)(2)(A) is based: whether the debtor, at the time the debt is incurred, subjectively intended to repay the debt. For example, when a debtor uses a credit card with no intention of honoring the obligation, it may be less morally reprehensible when such transactions are made for necessities, such as for food, as opposed for luxury items, such as jewelry. Yet, it is still fraud nonetheless. Robin Hood may have stolen from the rich, but it was still stealing.

The suspect timing of events in this case also raises an issue as to the applicability of § 523(a)(2)(C) upon which the Plaintiff strongly relies for a finding of nondischargeability. Section 523(a)(2)(C) creates a statutory presumption of fraud for two types of transactions conducted in the time immediately preceding the petition date. First, nondischargeability is to be presumed in any case in which a debtor, within 90 days of filing for bankruptcy relief, incurs consumer debts in excess of $500.00 to a single creditor for "luxury goods or services." 11 U.S.C. § 523(a)(2)(C)(i)(I). Similarly, nondischargeability is also to be presumed in any case in which a debtor, within 70 days prior to filing for bankruptcy relief, took "cash advances" aggregating more than $750.00. 11 U.S.C. § 523(a)(2)(C)(i)(II).

Arguably, as the Plaintiff puts forth, some of those transactions made by Ms. Brumbaugh on the Plaintiff's credit card could fall within the scope of § 523(a)(2)(C)'s nondischargeability presumption. For example, the second and third balance transfers made by Ms. Brumbaugh, totaling $7,500.00, were both made 69 days before Ms. Brumbaugh filed for bankruptcy, thus falling within the 70–day period applicable for "cash advances" in § 523(a)(2)(C)(i)(II). Furthermore, all of those charges made by Ms. Brumbaugh, whether the balance transfers or the retail credit transactions, occurred within the 90–day period applicable for "luxury goods and services" in § 523(a)(2)(C)(i)(I). Nevertheless, the applicability of either of these provisions cannot be assumed.

For example, insofar as the Court can tell, case law has been universal in holding that balance transfers on a credit card, such as that made by the Plaintiff, do not qualify as "cash advances" for purposes of § 523(a)(2)(C)(i)(II).[2] Additionally, many of those charges made by Ms. Brumbaugh,—such as at "Corey's Mulch and More" which she explained involved purchases for minor home improvements— would not appear to qualify as "luxury goods and services" for purposes of § 523(a)(2)(C)(i)(I). Luxury goods and services are defined by the Bankruptcy Code in the negative, as not including "goods or services reasonably necessary for the support or the maintenance of the debtor." 11 U.S.C. § 523(a)(2)(C)(ii)(II).

2. *Chase Manhattan Bank USA, N.A. v. Poor (In re Poor)*, 219 B.R. 332, 336–39 (Bankr. D.Maine 1998); *First Deposit National Bank v. Cameron (In re Cameron)*, 219 B.R. 531, 536–37 (Bankr.W.D.Mo.1998); *Norwest Bank of Iowa, N.A. v. Orndorff (In re Orndorff)*, 162 B.R. 886, 888 fn. 2 (Bankr.N.D.Okla.1994). *National City Bank v. Manning (In re Manning)*, 280 B.R. 171, 178–85 (Bankr.S.D.Ohio 2002).

Regardless, as now explained, whether any, some, or all of Ms. Brumbaugh's transactions on the Plaintiff's credit card fall within the scope of § 523(a)(2)(C) is not really an issue that must be decided.

■■■■ As a basic evidentiary matter, the party asserting a claim carries the burden of proof. 29 AM. JUR. 2D Evidence § 158 (2006). A creditor, thus, seeking to hold a debt nondischargeable for fraud under § 523(a)(2)(A) is charged with establishing the existence of those elements necessary to establish a claim thereunder. *Grogan v. Garner*, 498 U.S. 279, 287–88, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). This burden is comprised of two components: (1) the "burden of persuasion" which is the necessity of establishing a fact and which generally remains fixed upon the movant for the duration of the action; and (2) the "burden of production" which is the necessity of making a prima facie showing and which may shift throughout the course of the action. *Virginia v. Black*, 538 U.S. 343, 395, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003).

■■■■ Under this evidentiary framework, an action brought under § 523(a)(2) will proceed as follows: If a creditor is able to present a prima facie case on all of the § 523(a)(2)(A) elements of fraud, the burden of production will shift to the debtor to establish a defense to the creditor's claim. If the debtor is unable to establish a viable defense, the creditor will prevail on its action. *Gore v. Kressner (In re Kressner)*, 206 B.R. 303, 309 (Bankr. D.N.Y.1997). If, however, a viable defense is forthcoming, it remains the creditor's overall burden to persuade the trier-of-

fact, by at least a preponderance of the evidence, as to the sufficiency of its claim.

■■■■ While the statutory presumption of fraud set forth in § 523(a)(2)(C) alters this evidentiary framework, it does so only as it concerns the creditor's initial burden of production. FED.R. EVID. 301.[3] If applicable, § 523(a)(2)(C) will shift the burden of production to the debtor, but the overall burden of persuasion will still remain upon the creditor. *J.C. Penney Co. v. Leaird (In re Leaird)*, 106 B.R. 177, 179 (Bankr.W.D.Wis.1989). However, the Plaintiff's case-in-chief in this proceeding need not rely on this statutory reallocation as to the burden of production. Based upon those points discussed already, whereby strong indicia of fraud have come to light, it can only be concluded that the Plaintiff has sufficiently established a prima facie case for fraud under § 523(a)(2)(A). Hence, irrespective as to the application of 523(a)(2)(C), the burden of production has shifted to Ms. Brumbaugh to set forth a valid defense to the Plaintiff's allegations of fraud.

■■■■ To rebut a prima facie case of fraud under § 523(a)(2)(A), a debtor must come forward with evidence which raises in the Court a credible doubt as to the existence of fraudulent intent. This may be accomplished, for example, by showing a sudden change in circumstances or that the debtor did not contemplate filing a bankruptcy petition until after the allegedly fraudulent transaction took place. 4 Collier on Bankruptcy ¶ 523.08[5]. In this respect, it is Ms. Brumbaugh's position that her transactions with the Plaintiff,

---

**3.** Rule 301 of the Federal Rules of Evidences provides:

In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast. This Rule is incorporated into bankruptcy procedure by Bankruptcy Rule 9017.

particularly the balance transfers totaling $17,171.98, were done not in anticipation of bankruptcy, but rather in "an attempt to realign" her finances due to her upcoming divorce. (Doc. No. 22, at pg. 1).

Despite the inferences of fraud that exist in this matter, Ms. Brumbaugh's explanation, regarding the realignment of her financial situation, does find support. At its most basic level, there is no dispute that Ms. Brumbaugh and her now ex-husband, Mr. Brumbaugh, were having marital difficulties at the time the charges in question were being made. Similarly, there is no real disagreement that, during their marriage, the Debtors experienced financial difficulties. But especially mitigating against the existence of any fraudulent intent, and lending strong credibility to Ms. Brumbaugh's account of events, are the types of transactions which are at largely issue: balance transfers.

Balance transfers, such as the three transacted by Ms. Brumbaugh, do not increase a person's overall debt; they merely substitute one debt for another. Resultantly, unlike with a cash advance or the purchase of goods or services, a debtor transacting a balance transfer receives no immediate pecuniary gain. And it goes without saying that, in the absence of an immediate pecuniary gain, a debtor's motive to fraudulently engage in a transaction involving a balance transfer is dampened. *Chase Manhattan Bank v. Poor (In re Poor)*, 219 B.R. 332, 337–38 (Bankr.D.Me. 1998) (listing cases whereby courts have found balance transfers not to be indicative of fraudulent intent).

The usual motive, instead, for conducting a balance transfer is to reorganize one's financial affairs, commonly through better terms offered by the new lender—

for example, a lower interest rate. Mirroring this function, Ms. Brumbaugh testified to the effect that she made the balance transfers to the Plaintiff's account for the reason that they were offering 0% interest. However, the reorganization of one's financial affairs goes completely inapposite to the function served by a Chapter 7 bankruptcy: an immediate discharge of one's debts in exchange for the liquidation of their nonexempt assets. As such, the existence of the balance transfers in this matter weakens a key component of Plaintiff's case: that the balance transfers made by Ms. Brumbaugh were done in anticipation of bankruptcy.

Also mitigating against the existence of any fraudulent intent is an often utilized indicator on the subject: whether any subsequent payments were made on the obligation, with the evidence showing that Ms. Brumbaugh made three payments totaling $357.00.[4] In *Mack v. Mills (In re Mills)*, this Court explained the importance of this consideration:

> Alone, a broken promise will not establish the existence of any intent to deceive. Rather, the existence of fraudulent intent under § 523(a)(2)(A) hinges on whether the debtor, at the time the debt is incurred, intended to honor the obligation. Although the intent to defraud must arise in conjuncture with the debt, a debtor's subsequent conduct will often help to shed light on the debtor's state of mind at the time of the transaction.

> Of significance, a debtor acting with the intent to defraud will not generally undertake measures to perform their obligation. And logically, the opposite also holds true; where a debtor undertakes

---

4. Although two of the payments were made after the issue of bankruptcy had been raised by legal counsel, thereby raising an inference that such payments were only made on the advice of counsel so as to deflect any inferences of fraud, the Court has nothing by which to substantiate this.

significant steps to perform as promised, any inference of fraud is muted. On whole then, a type of an inverse relationship exists when weighing a debtor's intentions: the further the extent of performance, the less likely there exists fraud. To use a simple credit transaction as an example, it is the highly unusual situation where a person taking extensions of credit—e.g., cash advances—with the present intention of converting the funds will make any meaningful attempt to repay the obligation.

345 B.R. 598, 604–05 (Bankr.N.D.Ohio 2006) (internal quotations and citations omitted).

In weighing the evidence in a case brought under § 523(a)(2)(A) for fraud, the Court in *In re Rembert* held that a court should not engage in "factor-counting." 141 F.3d at 282. Instead, *In re Rembert* the Court explained that what "courts need to do is determine whether all the evidence leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent." *Id.* In accord with this directive, it is the conclusion of this Court that, based upon those mitigating considerations just discussed, not only has Ms. Brumbaugh rebutted the Plaintiffs prima facie case for fraud, but that the weight of the evidence in this matter is equally balanced. However, what finally tips, ever so slightly, this balance in favor of Ms. Brumbaugh is the credibility the Court attaches to her testimony.

After having had the opportunity to observe her demeanor, the Court found Ms. Brumbaugh's explanation for the suspicious timing of events to be genuine and sincere. She explained that, before considering bankruptcy as an option, she was attempting to get a handle on her financial predicament, which was only being exacerbated by the breakdown of her marriage.

According to her, the "balance transfers" to the Plaintiff's credit card, to receive a lower interest rate, simply constituted one facet of this attempt to get a handle on her financial situation.

The credibility of Ms. Brumbaugh's account of events is only reinforced when it is considered that, while incurring most, if not all, of the charges on the Plaintiff's credit card, Ms. Brumbaugh was making a good faith effort to sell her residence. This begs the question: if Ms. Brumbaugh had been intending all along to forego her legal obligations to the Plaintiff by filing for bankruptcy then why, when incurring the debt, was she going through a concerted effort to sell her residence? She could have simply surrendered it through the bankruptcy process. In this way, it appears that bankruptcy only became a serious option for Ms. Brumbaugh once it was realized that her residence, a major source of financial strain for the Debtors, would not sell quickly thereby making it nearly impossible for the Debtors, who were living apart and intending to divorce, to service the debt on the property.

In summation, while there exists very strong indications of fraud in this case, there exist slightly stronger indications that Ms. Brumbaugh did not intend to defraud the Plaintiff. As such, the Court cannot find that, as applied to § 523(a)(2)(A), Ms. Brumbaugh, with the intent to deceive, knowingly or with reckless disregard as to its truth made a materially false representation to the Plaintiff. In reaching this conclusion, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Opinion.

Accordingly, it is

*ORDERED* that the credit-card obligation owed by the Defendant/Debtor, Carley Brumbaugh, to the Plaintiff, Chase

918

Bank USA, be, and is hereby, determined to be a DISCHARGEABLE DEBT.

It is **FURTHER ORDERED** that the Plaintiff's Complaint to Determine Dischargeability of Debt pursuant to 11 U.S.C. § 523(a)(2), be, and is hereby, DISMISSED.